2-0-0-2-0-9 Richard Cooke v. Bethlehem, Auburn-Dot, Plainfields-Athens, Cross-Counts Maxum Sports Bar & Grill & All-Inc. Defendant, Appellate, Cross-Athens & Gregory & Sarah Fain from Joseph & Co. Defendants Gregory on behalf of the Defendant, Appellate, Cross-Athens Mr. Michael L. Friesen Gregory on behalf of Plainfields-Athens, Cross-Counts Mr. D.M.P. Barksley Mr. Reesus Thank you and may it please the Court, Counsel Good afternoon, my name is Mike Reesus and along with Ryan Greeley, I am here today on behalf of Defendant Appellant Maxum Sports Bar & Grill This is an appeal for my judgment for plaintiffs after a bench trial Plaintiffs brought suit to recover damages from the bar and its owners after another patron, Antoine Matthews, assaulted them in the shopping center parking lot around the corner from the bar premises We respectfully submit that the attack was not reasonably foreseeable and that we breached no duty of care when 1. No fight had taken place on the premises 2. Plaintiffs have voluntarily left the premises and their status as invitees ended before they were attacked in the parking lot and 3. The policy considerations used in the traditional duty analysis do not, on balance, support the judgment If we are correct, the judgment below cannot stand Now the general rule is easy to state The rule is that any duty of care ends when an invitee voluntarily leaves the premises But by law rules, there is an exception and it is a limited exception The exception recognizes a duty to provide reasonably safe ingress and egress beyond the, quote, precise boundaries, close quote when you have two things going on 1. The attack takes place directly outside the premises and 2. The defendant immediately and directly increases the risk and contributes to the injury Now we cited the leading cases in the briefs where liability has been recognized off the premises in Halt, Osborne, and Shortall Defendants had noticed that ejected customers would attack other customers and in each case, the defendants had increased the risk by sending those customers directly into the path of a known danger such as simultaneously expelling fighting patrons Doesn't they have some notice here that Mr. Matthews was, let's just say at the least argumentative that night and they had had somebody follow him Didn't that alone kind of put them on notice that something's amiss here? Well, on notice of what? On notice of an aggressive customer There's no question that I think we ought to concede based on the evidence that he was, Matthews was loud and obnoxious and sufficiently loud and obnoxious that with the plaintiffs disruptive to the point that all three, according to the judge, were asked to leave Plaintiffs denied they were ejected but the judge found that they were disruptive to that point but there was no fighting that took place on the premises and if you look at the three cases if you look at Shortall, Osborne, and Halt you had fights, not just arguments Now, I found it interesting that if you look at Osborne, you have a fight that starts inside between the bouncers and two drunk teenagers and in Halt, you have a fight that begins inside when a customer, quote, tossed, close quote plaintiff across the room and then the plaintiff tells them to leave and in Shortall, the fight begins when one of three customers threw an elbow into the plaintiff's back and he went over a table we don't have anything comparable like that here the judge, I found it interesting if you look at the judge's decision she, and she really did go through the evidence she describes it in different ways she talks about, well there was a verbal altercation or there was a argument at one point, I think she says that it was verbal fighting, okay but there's never a real fight is that required? that's what the cases have required that's what they had is that what they required? they all say that once the fight starts it's reasonably foreseeable it's going to continue outside but it starts inside we don't have that here I know the plaintiffs try their best to get that into the record the judge never found that there was any fighting real fighting inside it was always verbal that's why, so to go back to your question Justice Spence was he argumentative? absolutely I think you'd have to say that there was, all three of them got into it to that extent but this case involves arguing patrons not fighting patrons what about the fighting? I'm going to say that many of the words that were exchanged were the fighting words under the first amendment? probably, yes that's right and so while nobody at least until we know later pushed or shoved or something of that nature we do know that there was a lot of insulting language epithets of some of these this was not a literary debate not at a bar not at 1.30 in the morning okay, I'm with you there but the cases all involve more in the way of a serious physical altercation than we have here well, what about the little, we'll call it the little attempt in the front right at the door where Mr. Matthews takes Mr. Cook's arm and tries to take him to the park he did not take his arm he did take his hand he took his hand well, they weren't shaking hands no, you're right I'm not saying that although, there was an expert who said that but look the judge was acting as fact finder and I can understand if you want to say that it was that yes, he took his hand to pull and then Cook pulled back pulled away free and clear I got that certainly didn't take place you can see it on the video but I would not put that in the same category of a physical altercation as we've had in the cases that I've just described and it's really those three cases that establish the when it becomes reasonably foreseeable and before you can get any type of breach of duty you have to show that what took place was reasonably foreseeable and what's the standard for that? it is an objective standard it is not what is conceivable it's not what might possibly occur it is what is likely to occur it's based on probabilities and remember what we're dealing with here we're dealing with a criminal act we're not dealing with ordinary negligence and it's much easier and I think Marshall v. Burger King the case that's discussed in the briefs makes this point Marshall talks about how well it may be more easily foreseen that someone will negligently drive a vehicle in such a way as to go into a building but it is not as foreseeable that a crime will take place and what you have to ask yourself is was it reasonably foreseeable that from whatever is depicted in that gesture or in that one action would make an assault reasonably foreseeable let's look at what we do on a daily basis the three of us I don't know that you do as much of this Mr. Reeses but we do divorces we do murder cases we do all sorts of criminal cases that have started with somebody saying you owe me money and that's what this allegedly started over and you know what Judge in Lewis v. Raspberries it started with an ex-boyfriend who said I'm going to shoot you when you leave here that's Lewis that's an ex-boyfriend but here we're arguing over 20 bucks was it won in a pool game was it put down to buy some drinks what was it somewhere it disappeared and these people are fighting over money they are arguing over money and in Lewis I can say you know what it's more foreseeable that an ex-boyfriend in a fit of passion shoots his ex-girlfriend than it is that somebody is going to do commit a battery and get sentenced to jail over 20 bucks I mean you know well they call Mr. Matthews a hustler this wasn't my term this came from somebody he's a hustler he tries a hustler is a guy who tries to take money or take things improperly it may just be coincidental but in two of the cases cited Walton and the other one might be Bedillo or St. Phillips I can't remember it started over a bar over a pool game a bed in a pool game and in each case the court said it wasn't reasonably foreseeable and I think that's part of I think what the problem here is that for the judge to reach the conclusion she reached she had to take what was a case that did not involve the facts of Haught and Short Hall and Osborn and try to make it something it wasn't which is it's a verbal altercation it's verbal fighting it's fighting words but at the end of the day they're words and whether you can say from that fact alone that there's been an argument that there's a duty to foresee what's going to take place when they leave the premises I think that is a stretch well there is something interesting that happened and I have not seen this video but on this camera that's looking at the front door yes apparently Mr. Matthews goes one way and the other two go this way so Mr. Matthews comes back into the picture and there is some pointing is the pointing in the direction of where the victims went because then he goes in that direction well certainly the judge you know what I don't I did not look at the video right before I came out here certainly what happens is he leaves first in one direction and the judge makes the point that he did come back in the frame after the plants had left and Matthews had one explanation for what happened the judge didn't accept the other explanation is that he would have followed them out into the into the lot but look at this the bouncers are not law enforcement people they can't detain Matthews at the entrance they were told by the sheriff's department they were not supposed to go into the parking lot it is a common parking lot it is not their parking lot they were told not to get involved and if there was a crime they were supposed to call the police I'm sorry to say it was after the attack when Aubrey Jett came back they did call the police but the point is that what they knew at the time was Matthews had no history of violence he may have been loud he may have been obnoxious he may have been argumentative no history of violence he was not drunk and it was not foreseeable I don't believe that it was reasonable to assume that Matthews would violate the law what part in this scenario did the fact that this is a strip mall and this happens in a lot of places that gets zoning and gets buildings and businesses in there that don't meet the parking requirements for restaurants you have to have X amount of parking spaces to facilitate here they're in a strip mall and you've got this parking area I believe the evidence was in order to go to this place at the hour they went there was nothing in front to park that they had to actually kind of go toward the end, three buildings down to find the parking place no I think what the evidence was when they got there between 11 and 11.30 it was a fairly decent sized crowd that evening and the parking spaces were fairly filled so they had a park around the corner in an area that they were entitled to park in and there was never any claim made in this case that there was any zoning issue I'm not talking that there is a zoning issue I'm saying because they had they were going to Maxim's and because there were no parking spaces directly in front where the camera could have seen, they intended to go to Maxim's had to go around the corner how does that not put Maxim how does that parking arrangement not put Maxim on some notice that things could be happening that they should be concerned about well if it's off the property and it's out of view I'm not too sure how it's only out of view because they've got a good crowd that night I'm not sure it's off the property this is a common parking lot for these common buildings the landlord has the right of control for the parking lot the landlord has all the responsibility the landlord decides whether to police it or how to police it it's not, we don't have any responsibility under the lease for that and the last thing I want to say because I know my time is probably getting a little bit short is let's stick to one side for the moment, let's assume that I don't know that there was any issue as to whether this was reasonably foreseeable then the question becomes whether or not there should be a duty extended in this case that goes well beyond the boundaries and I'll simply say this and I don't mean to make this a pun, this case is trying to push boundaries I'm sorry this case is pushing boundaries pushing boundaries in the sense that it's trying to impose liability beyond where other cases have recognized liability and for and that would require someone to provide an escort or a chaperone for a distance that goes beyond anything that the law has recognized to date. But I thought that even though they weren't trained, Mr. Jarrett said that there was a policy, an understanding that if there was this altercation or any altercation, whether and people were put out, they would kind of hold one group back to make sure the other group was They would, well certainly they would try to separate in time and space, but that only gets you out the front door. That doesn't necessarily get you what happens beyond the front door. Well if they keep you inside until the other party is well out the door. Well, Matthews went around the corner. He came back. He came back, that's right. He came back. There is something on that video that I recall reading about that said somebody pointed in the direction of the plaintiffs. I don't know if it was Matthews or if it was the the bailiff who may not have understood it. I don't know. You know, I guess we would both be looking at that video then after this argument, but for all the reasons set forth in our brief, we ask you to reverse. Thank you. Thank you. Thank you. Yes. Mr. Gursky. Pleased court counsel. My name is Steve Gursky, the most impossible name to pronounce because I have a T in there. Just pretend it's silent like I do. I would like to cover a couple of things here. I know I have two. I have my appeal, my cross appeal as well, so I'll try to cover them both. I'll try to cover them as quickly as I can. I would like to start by talking about Mr. Reiss's brief and what they state. Here we have a finding by court, the trier of fact, that found some important issues here that all the justices here have raised. Counsel states in his issues presented for review that the plaintiffs left voluntarily. The trier of fact found that that was not true. In fact, they were ejected essentially at the same time. That was one of the reasons she predicated her decision. If you take a look at the line of cases, including the defense cases in which they found that there was no foreseeability, in those cases the courts recognized that if you have a situation where they are both ejected, that they have contributed to the problem. At the trial, it was very clear that Mr. Jarosz stated that this man, Matthews, was looking for trouble. He mentioned no words about that until it came time for trial, then he backed off. As someone once said, you're not doing good deeds if you're looking for trouble. The finder of fact in this case also recognized that he was a gambler. Mr. Jarosz himself stated that this man was a hustler and had been tossed out in the past for hustling. He did it that night, twice before, and they had to put a bouncer on him. Much as the term troublemaker is not a term of use, it was the action of actually putting a shadow, as he says, on this individual, something he would do for a person who was going to have innocuous actions that evening. It did erupt. In fact, it was stated by all three of the witnesses that it was so loud, the shouting was so loud, depending on what shouting you believe, that the entire bar could hear it. According to Mr. Jarosz that evening, there were somewhere in the vicinity of five to seven bouncers and about 70 people in the place. All three of them said the entire bar could hear it. Presumably, that would include the bouncers. Additionally, the finder of fact could easily have taken a look at the testimony of Mr. Cook, who said that he was shoved in the bar, recollecting a bam back in the case of how although they said tossed, he later conceded that in fact he was merely shoved at that bar. Again, that was still an important factor. Certainly, that testimony came out in that case and it came out in this case. As Justice Hutchinson noted in the film, Mr. Matthews does come back and see him. He does point in the very direction that they go in and he conceded that was him racing out in that direction. It is in the testimony and he states it. What's really kind of chilling about that is there are two bouncers also immediately thereafter watching the direction that those three people had just gone in. Another issue for review is that the assault occurred according to the statement of the defendant half a block away. That's what stated in Issues 40B. There's no testimony that this occurred half a block away. In fact, the finder of fact considered this an ongoing event from inside the bar to in front of the bar to outside the bar. Again, one takes a look at the long line of cases, whether they find for the plaintiff or not. In each one of those, there is that exception carved out and Shortall states it clearly that if the issue starts inside the bar, then it is considered if it ends outside for all intents and purposes, it is considered within the premises. Finally, on the issue of business relations, they were in the midst of egress and that is also found by the trier of fact in this case, and they were still protected as business patrons trying to get out as quickly as they could. You've said the issue started in the bar, and of course Mr. Recess will say, no, it has to be a fight. What's your position on it has to be a something that's happened, a fisticuffs, you say a shove, somebody's bleeding, what is a fight? Thank you, Your Honor. I wanted to get to that. That was in fact my next point. I believe Justice Spence brought that up. What he was looking for, and I believe this is the statement, a criminal act by a third person is reasonably foreseeable when the circumstances are such to put a reasonably proven person on notice of the probability of an attack or, and this is the part that was stated, when a serious physical altercation has already begun. What you have in this instance is, as you pointed out earlier, when you have these verbal threats, is there a probability of fact, of attack? Not attack, not physical violence. There are two separate and distinct aspects of this case. The case law that states that. There was physical manifestation as stated and seen in the video. There was an instance where we were caught on film of Mr. Matthews trying to drag Mr. Pope out. Mr. Matthews, in fact, on witness stand, stated yes, I'm trying to pull him out to the parking lot. There was not a handshake, as stated over and over again, that was not a friendly gesture. That was attempt at violence in front of the bouncer. You can see the bouncer in the film rocking back and forth, watching this. You also have testimony that these people, as stated in other case law, asked for help. They had just been ejected from this bar. The trial found it was essentially simultaneously. They, the bar's action increased the risk, which is in every one of the cases cited by both plaintiff and defendant, as an exception to a general rule in which there is a problem. Again, short all, if it starts inside the bar, the finder found it starts inside the bar. The rule is you treat it as though the occurrence happened entirely inside the bar. And, finally, before I move on to my other issue here, the law litany of events that occurred that put them on notice is listed by the trier of fact. I found  eruption of the fight around the corner, which, according to the finder of fact in this case, occurred about one minute after these people left the film. And then they go, of course, to the next film, which shows the final act of Mr. Matthews. But this was all a progression and the finder of fact had a reason to believe that. On my second issue Before you go to your second issue, let me ask you, what is the, for the bouncer at the front door, what is the minimum that he should have done? That a reasonable, cautious bouncer in that situation should have done? Thank you. That was addressed by both the experts, both defendant and defendant. And it is also stated by Mr. Droz who stated that he taught these people this, separation in time and space. That's the bare minimum. Had, if you take a look at this in the second film, these people were trying to get into their car one minute later. Had this Matthews been held for two minutes, we would not be here today. Well, can they hold him? They can't necessarily detain him, can they? They can hold, they can escort. The very presence of the bouncer was enough not to pummel. He was waiting to get a little further away. And that was clear. Or, maybe he just held that, I'm not exactly sure. But this man was a monster of health to do damage. Would it have been enough if the bouncer had just said, hey buddy, just hang out here for a second. Just chill for a second. You know, just talk to him. Because there's no evidence that he did it. Is there any evidence that he spoke any words or did anything? There is no evidence of that. None of the people who were working over there were pleading with him. That's what they said. You can see them talking to him. There's no evidence that he even responded. So there was, he actually did nothing. So the bare minimum is certainly not nothing. Beyond all that, could anything have stopped Matthews? I would reasonably say if not absolutely yes, I would say certainly there was no attempt whatsoever by Mr. Matthews or by the bouncer in any way to de-escalate is the word that both experts used in this. Nothing at all. And a view of that film shows an escalation and again as Justice Huckabee said, you see him in the film seconds later always pointing in an angry tone in the direction that they go and then you see his arm in the last bit of the film heading in that direction while the bouncers watch. Not one at this point but two bouncers watching this. I do think that those are important aspects. He did nothing. And again, under the case law, as Jerome said and the primary fact found these people were ejected. That's the finding of fact. And that's where the issue of the enhanced problem increasing the risk and that's how one of many reasons why the bar is accountable in this instance. So there are at least three different reasons that have been found in all of the case law for finding a bar accountable. I just want to mention that in this case although I think the justices are well aware of it the restatement says that you have to take a look at the character of the place. Certainly these people knew the character of the place because we needed five or seven bouncers and they created an issue by the very elements and aspects of this place. Alcohol they set up things for gambling and boxing and so forth and as came out through plaintiff's expert one of the statements given by a bouncer whose name we still don't really know was that there was trouble every weekend. So in a general sense and this kind of segues into my second aspect of this case there was a lot of problems at that place and a lot of the problems we had in this case was simply the bouncers were unknown. Jim Miller or Jim Galison, we don't know. He's the guy we put in charge of things and we don't know his name. The man that's standing in front, his name may be Zielinski or something we don't know anything about him. Every opportunity that we had in the state throughout there to find these people absolutely nothing. This place was run recklessly and there's no doubt about it that the owners of this establishment knew perfectly well that Mr. Jarosz did not know how to run a nightclub. What's also apparent is they did not care. They issued checks and were paying these guys under the table but they didn't even know their names. They knew perfectly well that they put in charge someone who didn't know how to provide proper security and the only instance we have because the only instance we know of and the only person we've ever talked to was in this instance where we see improper conduct by the people that are supposed to be providing security. The case law out there states that the owners of this bar they were the sole owners stockholders, they designed the building, they did all these things for it, they delegated the duty to someone who didn't know what he was doing and then as Mr. Tokor said on the witness stand when asked well do you care about security? The answer was no. Not no sir not you know I'm concerned about this, no I know I'm running a nightclub and there's trouble every week and you know those are things that me as an owner of a business should be concerned about. Nope. But again the point of my appeal is that I think that Judge French got off on the wrong path because she says that this was we failed to meet a prima facie case and so that's a question of a matter of law and I think that she kind of confused the case law out there by stating that the individuals needed to be present or this was not part of their corporate responsibilities and reading the case law that I presented before your honors I think that that's not the case I do not think one needs to be present the ancient case of 1884 PEC that you know certainly there was a case where the owner of the establishment was held accountable for creating the policy. I think that this is somewhat similar in this instance they created this and then they step back and they don't do anything I think that there is ample evidence presented by the expert in this case by testimony of the witnesses particularly Mr. Tocla when he just didn't care that they had abrogated their duty of supervision not delegated abrogated and I think that he's I think if this was looked at properly the judge needed to understand it did not need to be there and that attitude did not need to be present on the night and took court and served and were not there but their duty of supervision remained and it remained learned and out there. I think the court needed to recognize physical presence was not necessary and I think the court needed to recognize that they still had a responsibility there is a recent case that came down from the Supreme Court Brown Burger where again they recognized the corporate officers who were not present. This was a last year. That they did not need to be present in order to find personal liability against those individuals so you have the two issues where I think the judge ruled and correct me on is corporate officers can be held accountable individually and that they do not need to be present. She said I failed because it wasn't their corporate duties therefore they cannot be held liable and furthermore I had no evidence that they were there so I failed to meet my prima facie case I don't think that's necessary. Did you have in the complaint a negligent hiring or negligent supervision count per se when it came to Mr. Topol and Mr. Serafin? Your Honor no. And what we did do though, we asked that the proceedings be amended and we did this right away based on the evidence that had already been out and we did do so and I will tell you that we did not amend our complaint until later when we asked that it be amended but we did ask that the proceedings conform to the testimony already done. So what was the action or what was the nature of the action that you had against Topol and Serafin? Just that they were responsible? It actually we put it in there in paragraphs G and H in the original complaint. It was there, it was supervision so the language was there but I think what the court maybe didn't recognize is supervision, I didn't mean supervised that night and so we fleshed it out in a greater form in the pleadings but we'd already gotten out the issues that I thought were important we never alleged that they were there that night because we'd already done our homework and found out they were not but we felt that they were individually liable because of the progression of, again, the word abrogation of their responsibility to supervise. And your experts talked about what they should have done for security and I don't recall testimony that Mr. Generals or however you said the name was not qualified did I miss that in the testimony? The expert did say he was not qualified as a matter of fact, Jerome's although he didn't say he wasn't qualified said he had no experience in this as I said the trouble that we have with this is that we have bouncers who have no real names we have no one else to talk to our investigation led nowhere which in fact, I think in a certain way bolsters our position that this place was ill supervised, ill managed and Mr. Geroves himself said he had no background in security. The facts of the case were that there was ample testimony that came in that showed that this place was not a well run organization. Trouble every weekend and you may have noticed but it was only a night club on the weekends. I don't think this place was ever a family place. Just a thought. Any other questions? No. Thank you, you'll have five minutes until you run. Okay, let's go to the cross appeal. And Justice Hutchinson you raised an issue about the motion to amend. They did attempt to amend their motion their complaint after the directive finding was made but then they withdrew that motion and then they renewed that motion after their post judgment motion was denied and after the court denied it they made no issue of it in their brief. So I don't believe the motion to amend is really properly before the court. Let's talk about what they actually pled. Two counts. One count for Cook, one count for Olbrich yet. We only have two allegations regarding the security guards. G talks about negligently failed to properly train and supervise the guards and H is regarding instructions to the security guards. Well, first of all the judge found there was no evidence as to improper training. So if there's no evidence shown as to improper training, then I don't see how they can have any individual responsibility for something the plaintiffs didn't plead and prove or didn't prove. And with regard to the instructions about their obligations ending at the front door, again they delegated to Jerome's. There was no allegation that Jerome's was unfit for the position of general manager. All the evidence was to the contrary. It's summarized in the briefs. I don't really want to go into it except to say he managed to place out in Colorado for eight years. It included security. Then I hear all this argument today. All this argument today about how terrible a place this was. This is really a terrible place. How many fights were there in five years? Three. Three fights in five years. How do we know that? It's in the record. Everybody testified to it. In fact, the plaintiff, the plaintiff's office said, yeah, that's a low number. But I thought we didn't keep any security logs. So this is all familiarity? This is three times the police have been called? It's all from police reports. Okay, so three times the police have been called. Three reports. No other security log for whatever reason. We've got three. And even the expert says that's a low number. And if you look at Davis, if you remember Davis, they had four in 90 days and the court said well, that's not enough to put you on notice if you need to hire more guards. That's three police calls for fights. Is that correct? In five years. Yes. So there may have been other unreported to the police. It may not be in the record. Right. But I'm just telling you that you can only decide the judge can only decide what's in the record and not what's outside. It wouldn't have been speculation. So when it comes to the issue of other incidents, three does not establish foreseeability. The judge unfortunately did refer to the fact that there were other incidents to support a finding. But I don't think the number of incidents People testified to those. As I recall, looking at the testimony, there was some testimony from Mr. Jarosz. There was testimony maybe even, I don't remember who it came from, but there was stuff going on in there. There's drinking, there's unauthorized gambling. There's things that could generate discontent. And those are my words. And there were, you know, pushing and shoving. I don't know how big this place is, but you've got The capacity is 175. Six or seven bouncers, so that's okay. No one criticized the number of bouncers. I mean, that's a good number. It's a good ratio. And they work in cameras. There is absolutely no evidence that would have supported any issues related to each other, but with respect to their appeal, in terms of the cross appeal, no issue as to active as to they were running such a terrible place. Okay. I mean, there's no evidence in terms of their active participation. They delegated to someone who was not found to be unfit. So there's no basis to overturn the directed finding. I want to go back I want to go, if I can, to rebuttal on our appeal. Unless there are other questions about the cross appeal. Opposing counsel talks about how Matthews was quote, looking for trouble, close quote. That came from DeRose, who explained, all he's saying is Matthews is obnoxious and he talks to a lot of people. That's what looking for trouble meant. It didn't mean the guy was looking for a fight. The guy had never been involved in a fight. He had never made any threat of a fight before that evening. Justice Pence asked the question and I think opposing counsel gave the argument, or made the argument that, well, the monster should have held Matthews at the front until the plaintiffs could leave. The evidence comes from the experts. It comes from all the witnesses. They don't have the ability to hold Matthews, to detain a private person. They are not law enforcement. In terms of the sequence of events they were not simultaneously expelled. Testimony is Matthews leaves first. He leaves then Cook leaves. Cook says, I wasn't ejected. Judge says, that doesn't make any sense. Finds that, yeah, he was ejected. Matthews leaves. Cook then leaves. Overjack comes onto the scene, into the frame after Cook is there. Matthews is at that point, he is outside. All right. I don't think that Matthews had any real criminal history either, but he still went to prison for three years. What is the circumstance at that time? I agree. That's what you're looking at. It's not what the 2020 hindsight is. Just compare this case with the other cases where liability has been recognized. You have a lot more going on in those cases. If you look at Hopped, which is one of the cases where liability was imposed off the premises. You have evidence that the defendant knew that he had that the wrongdoer had a propensity towards violence, and the testimony is that they were simultaneously ejected because quote, Bam, Bam's a bad guy. Any guy named Bam probably is not a good guy, basically hit a plaintiff and the two men went fist and cuff. That's a bar fight. If you look at Osborne, they were doing karate moves on each other. If you look at Shortall, you've got somebody who's going across the table. You don't have this here. I understand that it was obscenities, and it was clearly argumentative and not in the literary sense, but it's not the type of serious physical altercation that puts a reasonable owner on notice that it is reasonably likely that an attack will take place outside. The last point that I want to get to is if you even if you agree with the judge on everything else, on everything else, what happened inside, what happened outside, who's pointing where, you still have to ask yourself at the end of the day, well, there are these other factors that go into the duty analysis other than foreseeability. Just because it's foreseeable doesn't mean you owe a duty each and every time. To go to your point, Justice Hutchinson, about where somebody parks. I think the testimony is that Rebecca Overjack parked in the first spot that she saw that was available. It wasn't the only spot. It's just the way the parking was there. Because you could park anywhere. She parked where it was convenient. And it was out of view. She could have waited for somebody to leave. She could have. It was up to her, right? She wanted to go there. Your clients advertised, I assume, that this is a great place to come. Sure. And so she wanted to go there. She'd been there before. She goes on it. She finds a parking spot. It's 1130 at night or something like that. Let's go in. Let's have a drink. Let's play some pool. It's not like she was parking on the street. She was parking in the lot that was provided generally for this establishment and five or six others. All right. The landlord owned and controlled. All I would want to close on is on this note. This case is not like any other case in two respects. One, as I already mentioned, there was no actual physical fight. The other thing that I want to emphasize though is when it finally did occur, it occurred without the bouncer's knowledge and out of their view. Every single case to date has had where liability was imposed, you had the fight take place right outside the door. In each case, somebody takes a step. Well, there wasn't much of a punch, but you get the idea. You had it happen right away. In one case, they watched the fight through the window for 15 minutes. In another case, the owner told everybody in the bar, leave through the back because there's a fight going on out front. This case is asking you to push that boundary. We know, Justice Spence, you wrote the decision in 2013 that we can go beyond the precise boundaries. I'm not here saying that you've got to draw a precise boundary. The law has gone beyond that, but the law has not yet gone to the point where an owner is liable for something that takes place out of view and without its knowledge, and even the judge acknowledged that in that situation, there would not be liability. But where she was hung up was on the idea that this was foreseeable, and then she didn't want to talk about the other factors. She didn't talk about the other factors. We heard about the foreseeability. We didn't hear about the other factors in the memorandum of opinion and judgment. I know my time is up, and I want to thank the Court for hearing us for oral argument today. I know we don't get oral argument in every case, and it's only by the grace of the Court that we get oral argument. So for all the reasons, we ask that you reverse. Thank you. Thank you. Ms. Teresa, something a little defending. I see you most often as an affilee, and a lot of affilees don't ask for oral argument. This is one of the first times they've seen you as an appellant in a long time. And they do ask, so please do a few. Yes. Yes, but again, thank you. Mr. Karski. Your Honor, again, I just want to cover three issues, and I think the rest of it is pretty well established in our briefs. To go back to the point of why we were asking that the court find the lower court in error was that she stated that we failed to establish a prima facie case. That is a question of law. Weighing the evidence beyond all that I think is unreasonable. The question that we have is did we actually establish a prima facie case, and does the case law previous from back in 1884 to the most recent case with the hazing, does that allow for these circumstances to have those issues, a corporate law officer and not being present. I think that she failed to recognize that and should have had to do. The other issue that I have is, again, I just have to point out that in the record it came in that there was trouble every weekend. I think the justices here were pointing out quite recently that there were in fact 55 police calls. One wants to bend them one way or another, but there were 55 police calls. There were no security laws. We don't know about that, but we do know that there was evidence that came in that there was trouble every weekend. Am I correct in my recollection that the judge found that there was no improper training, but then went on and said that the training that they did receive indicated they should have done something and they didn't? I believe the way it was stated and the way that the court found it was there was no evidence of improper training and she did find that their conduct demonstrated that whatever they should have been doing, they did not do. As Justice Spence points out, you could see this man doing nothing. We were hamstrung because we actually didn't have any of this. We didn't have laws. We didn't have all the things both experts said that a nightclub should have. They were absent. They did not exist. Even the actual names of these bouncers did not actually exist. So yes, it is true, Your Honor, that we did not present that they were ill-trained because we couldn't find them. All the new record that we have is what occurred that night and the only thing that occurred that night was something that is astoundingly against what both experts agreed would be improper conduct. Together with the idea, and this was admitted throughout the briefs, and testified to, that Mr. Jarros had no training. So if he's the trainer and he doesn't know how to train, and we see what transpired, one can only say that if that's the way he trains people, Mr. Topor was wrong. Yes, he should have been trained. I believe that covers it. I just want to mention one more time. There was a finding that they were ejected. I do think that's important. It's curious that the defendants themselves say that they were ejected, yet they ask that the prior fact be reversed because she found in fact they were ejected. I don't think that washes very well, and I believe that on the issues of liability of the bar in general, it is astoundingly clear it is in fact beyond those other cases because there is so much evidence of prior notice leading up to this. Both generally in the past, twice that evening, and the videotape which shows a progression of violent actions either through words or actions that continued on through from the beginning of this to the point that these people were laying unconscious in the parking lot. Thank you. We'll take the case under advisement for this case.